Good afternoon, ladies and gentlemen. We'll call the case of Jorge Mario Mendoza-Mazariegos which is Alberto Gonzales. And all counsel are present. And Ted Gould is with us by videoconferencing. Okay, he looks very good today, as usual. Yeah, thank you. Thank you. All right, who's going to start? Mr. Acosta? Yeah. All right. Good afternoon. May it please the Court, my name is Mario Acosta, Jr. I'm joined here today by Attorney Elsa Martinez. And we represent the petitioner in this case, Mr. Jorge Mario Mendoza-Mazariegos. With the Court's permission at this time, I'd like to request two minutes. I'd like to reserve two minutes for rebuttal. Your Honors, in immigration proceedings, it has already been established that the Fifth Amendment Due Process Clause applies. And embedded in that right is an alien's right to a full and fair hearing. There are different components to this right to a full and fair hearing. One of which is the right to counsel. Another of which is the right to a neutral fact finder. And another one which is the right to effective assistance of counsel. It is our position that this case presents a unique situation where all three of these rights are violated. And this is the reason why we're here with the Court today seeking redress. With the Court's permission, I'd like to begin by discussing the deprivation of the right to counsel that occurred in this case. Your Honor, for over five years, Mr. Mendoza was represented by an attorney by the name of Steven Peck. Mr. Peck made numerous appearances on Mr. Mendoza's behalf. Attorney Peck prepared the application for cancellation of removal, which was the sole form of relief that Mr. Mendoza was seeking in an effort to be able to acquire legal residency and remain here with his wife and his three U.S. citizen children. Can I tell you something? Yes, Your Honor. We know these facts backward and forward. Absolutely, Your Honor. The right to counsel, once it has been invoked, is one that the court has held that the immigration judge has an obligation to take reasonable steps to ensure its protection. Absent a known and voluntary waiver of that right to counsel, the immigration judge must take steps to protect it. In this case, it's our position that absolutely no steps were taken to protect this right to counsel. And, in fact, it appears that the immigration judge's active participation may have actually further deprived Mr. Mendoza of his right to counsel in this case. The first example involves the documented conversation that occurred between the immigration judge and Attorney Peck earlier in the day. Mr. Mendoza's hearing was scheduled for the afternoon. The actual content of the conversation is not known, but what is known is that apparently Attorney Peck went and spoke with the immigration judge off the record and made certain accusations. One of them being that Mr. Mendoza... Immigration judge. Tong. Fong. Yes, Your Honor. I'm sorry, I believe Fong. Fong? Yes, Your Honor. Thomas Y. K. Fong. Fong, you're right. Yes, Your Honor. The conversation, at least the way the immigration judge summarized it for Mr. Mendoza, was that Attorney Peck had come in and told the immigration judge that he was concerned that Mr. Mendoza would not make an appearance. He was concerned because allegedly Mr. Mendoza had not returned any of his phone calls, had not responded to any of his letters. And this was the very first thing that the immigration judge noted. What's troubling about this is the fact that at no point is there any evidence that, first of all, that Attorney Peck even had this conversation, aside from just the simple fact that the immigration judge summarized. Nor is it indicated whether or not the immigration judge had instructed Attorney Peck to be present. I mean, it's crucial here that at the time that the conversation was had in the morning, Attorney Peck legally was still his representative. It wasn't until the afternoon that a second attorney that Mr. Mendoza had contracted, in anticipation of the possibility that Attorney Peck would not be present, actually at least attempted to enter an appearance on the behalf of Mr. Mendoza. If our position that the record shows that whatever the nature of the conversation was, the immigration judge had already predetermined that this was Mr. Mendoza's fault.  Let me change the facts a little bit to see if I can probe to find out exactly what the objection is. Suppose come 1 o'clock in the afternoon Mr. Peck appears and says he's not ready to proceed because of all the things that were put on the record by the immigration judge, he purportedly said in the morning. That is that I tried to contact my client. He was not responsive. I sent him a letter. I made phone calls. So I just don't know anything. I didn't turn in the papers I was supposed to turn in two weeks ago because my client hasn't responded to me. So, Your Honor, I'm not prepared today. I need to withdraw. Whatever. Would the immigration judge have abused his discretion or violated a right to counsel or done anything else that would have justified granting the petition? If he had granted that request by counsel to withdraw, turn to the current petitioner and said, now what? Absolutely, Your Honor. He could have done those things. He could have done those things, but he elected not to. And, again, what's incumbent here is that the immigration judge had legal obligation to ensure that Mr. Mendoza's right, after he had invoked it, after Mr. Mendoza had made clear that he was invoking his right to counsel, that he take reasonable steps to ensure that that right was protected. Let's just go through the factual scenario. According to what you told us, he's had counsel. Mr. Peck has represented him for five years. But if the client doesn't cooperate with counsel, what is the immigration judge supposed to do next? That's an excellent point, Your Honor. And our response would be essentially that if Attorney Peck had been present in the courtroom, then all of the allegations that were being made would have been made on the record. The immigration judge would have had an opportunity to actually judge the credibility of both Attorney Peck and Mr. Mendoza. And I believe what was probably the most egregious error here is that at least he could have requested that Attorney Peck provide evidence that those communications actually had existed. I mean, it seems as though Attorney Peck didn't bring with him any copies of any letters, didn't bring with him a log of the phone calls that were made. And, really, Your Honor, what is also troubling is that, in a way, the immigration judge shifted the entire blame based on the off-the-record statements by Attorney Peck to Mr. Mendoza but yet he never questioned Attorney Peck as to why he had waited until the morning of the merits hearing to bring this to his attention. I mean, it's repeatedly in the record that, well, you know, Mr. Mendoza had two years. Counsel for the Respondent highlights that numerous times in their brief that Mr. Mendoza was aware, Mr. Mendoza had become suspicious, and so forth, and that he should have taken some steps. But at the same time, he had already elected to contract Attorney Peck to represent him. And, sadly, Attorney Peck waited until the day of the hearing, went behind Mr. Mendoza's back, informed the immigration judge of all of these allegations, and then, somehow, Mr. Mendoza is expected to make a knowing and voluntary waiver of his right to counsel under the immigration statute. Our position would be that the standard for a waiver of counsel is that it must be knowing and it must be voluntary. So, really, an off-the-record conversation with an immigration judge, you can't qualify that as knowing because at the time Mr. Mendoza was there. Here's the disconnect, because your client wasn't a part of that conversation. Yes. And so I'm not sure how that speaks to your client's right to counsel at all. And so I've moved the conversation with Mr. Peck to the hearing room. So everybody's there. Peck gets up and says the same things. I.J.'s talking to both of them. He'd be entitled to make the same decision, decides that what the lawyer's saying is what happened. And so he turns to your client and says, okay, now what? Is he obligated to give further extensions because at that point your client needs to find new counsel? Or could he go ahead and say, look, you've had five years. Enough already. We're going forward. Well, based on those facts alone, he wouldn't necessarily be obligated. But you have to also take into consideration that there's a whole second part to this analysis regarding the right to counsel that you also have to take into consideration, Your Honor. You have to consider that he was present there with a new attorney. The new attorney had already made his appearance. Even assuming, Arduendo, that the immigration judge had found good cause to allow Attorney Peck to withdraw as attorney of record, he had an attorney there, Nona Bochy. Attorney Bochy could have taken steps to then request a continuance on the basis that he had only been recently contracted. Here's the problem. This is what I've been really getting to. Can a petitioner indefinitely delay things simply by not cooperating with counsel, showing up two years later? Here's my brand-new lawyer. We've got to give that person some time to get ready. Next available spot on the calendar is another two years away. I mean, you could milk that pretty good, couldn't you? Multiple responses to that. But here, the facts show here that none of the delays were attributed to the client. And that was going to be exactly our point. If you consider the case of Vivas-Vivas, which was a similar situation to the case at hand, in that case, the immigration judge's decision was sustained because essentially it was shown that the alien in that case had taken steps in bad faith to delay his proceedings. This was the first time Mr. Mendoza had ever at all requested himself a continuance. And understandably so at this point. The immigration judge should have taken steps to protect that right. Implicit in what you're saying is that, in fact, what Mr. Peck said that morning to the immigration judge wasn't true. But isn't that kind of a problem? Because if the immigration judge is allowed to make an evaluation as to what the past history was, If what Mr. Peck said was true, then your client had gone nearly two years without being in communication with his counsel. And when the time came to have this hearing that had been scheduled a long time before, before which the immigration judge had made clear before he needed to submit updated material, background check, so on and so forth, none of which had been done, Why is the immigration judge compelled, because the petitioner says it wasn't me, it was him, compelled to accept the petitioner's version of it and give another two-year extension? Well, in this case, we would submit that the reason why the immigration judge should have been compelled to hold such a case is the complete absence of any evidence. Here you would have had a situation, assuming that Attorney Peck would have been present in the courtroom, that you would have had both sides. And again, in that situation, perhaps then the facts may have changed because at the end of the day, the court could make a determination that the immigration judge, in his exercise of discretion, weighed both accounts of the stories and made his own determination. Had Mr. Mendoza submitted everything that he was asked to submit, birth certificates, income tax records, letters from folks, and all the rest of it? Yes, he had. The only thing that the lawyer was required to submit was the security clearance, or whatever it was called. Background check. Background check, yes. Which Mr. Mendoza did indicate on the record that he had done. Why was not provided to the court? Again, you have to take into account that until that date, presumably, Attorney Peck was still representing him. It was Attorney Peck's obligation to provide all of that evidence to the court. Let me ask a question. Yes, Your Honor. Did you prepare the brief that was submitted to us? I worked on it, yes, Your Honor. I was a law clerk at the time it was prepared. You mean the opening brief? Yes, Your Honor. You know, there's a section in there where there's a reference to Mr. Mendoza. It runs several pages where the client is referred to as she. How did that happen? I can't tell you, Your Honor. I'm afraid that I did review the brief, and I did see that there were a few typographical errors. If that was the case, then I would apologize to the court for the oversight that the reference was made to a she as opposed to a he. The way it happened was we checked it online through Westlaw. You can do that. It was that those paragraphs were taken from another brief that involved a woman. That could perhaps have been what happened. Do you have anything to do with that? Your Honor, again, I participated in the preparation of the brief, so if there was a mistake there, I will admit to that mistake. Whether or not the question is if I was somehow cutting and pasting an argument, absolutely not, Your Honor. I may have obviously been going back to briefs that raised similar issues in order to better articulate the arguments that we were hoping to present to the court, but at no time would I ever purposely do something of that sort. But, again, if there was a mistake there, I do apologize for that, Your Honor. Counsel, I have a question for you. Yes, Your Honor. There's an opinion called Hernandez-Gill that I was involved in. It involves a statutory right to counsel. Yes, Your Honor. How does that opinion bear on your client's appeal? Our position would be that Hernandez-Gill really is dispositive of this case. It speaks to the requirement that an immigration judge must ensure that the right to counsel is protected, and that unless there's a knowing and voluntary waiver of that right, that the judge must take reasonable steps to protect that right. In this case, it's clear that Mr. Mendoza never knowing or voluntarily waived that right to counsel. It's clear that Mr. Mendoza at all times wanted an attorney present, which is evident by him not only having contracted Attorney Peck for five years, but also because he went to the extent of hiring a new attorney just in case Attorney Peck decided not to show up. In that case, the focus then after the denial of the statutory right to counsel shifted to the issue of prejudice, which our opinion is that the prejudice is clear in this case. The denial of a continuance led to the denial of a statutory right to counsel, and in effect, Mr. Mendoza was prejudiced because he had plausible grounds for relief, which was a cancellation or removal application, one that I would note that the immigration judge in Florence, Arizona, noted that he would be a good candidate for cancellation. And essentially, it was denied for lack of prosecution because Attorney Peck failed to abide by his duties, which was to ensure that the application was complete and that the necessary fingerprint checks were submitted. Our position would obviously be that in terms of the denial of the statutory right to counsel and the issue of prejudice under the traditional approach, that Hernandez-Gill is controlling and should compel the court to hold that Mr. Mendoza was deprived of the statutory right to counsel and that he was prejudiced by that depredation. Thank you. Let me ask you this. On page seven of your opening brief, starting at line 10, it states, at his September 18th hearing, the immigration judge infuriated at the fact that Attorney Peck and Petitioner were not prepared to go forward, but scolded them both and denied Petitioner's request for continuance. Now, where in the record does that come from, scolded them both? I don't remember reading anything about the immigration judge scolding Mr. Peck. Well, to begin, Mr. – There's no – oh, you got that? Yes, Your Honor, the scold reference was, I believe, in reference to the immigration judge's statement to Attorney Boachie, which, if my memory serves me correct, he does make the statement to him when Attorney Boachie informs the immigration judge that he had just received the files the day before that he needed a continuance. No, no, it says here, Attorney Peck and Petitioner were not prepared to go forward, scolded them both. It doesn't say that they were – he was scolding this other lawyer, who, by the way, is not a member of the California Bar. No, a member of the Wyoming State Bar, that's correct, Your Honor. Yeah, yeah, yeah. So it says he scolded Peck and the Petitioner, so where does it – where do you get that? I can tell you, Your Honor, because I do remember that section of the brief, that that was intended to address Attorney Boachie. If the reference was made to Attorney Peck, that's, again, another mistake that I guess the court is pointing out in the opening brief, which all I can do is apologize for. I don't think you wrote this brief. I did, Your Honor. You did? I helped author it, yes, Your Honor. Did you read it over before it was filed? To the best of my ability, Your Honor, yes, I did. Well, you have another sentence here. Despite Petitioner's pleas, nonetheless, the immigration judge denied the application. Please is spelled P-L-E-A-S-E. Is that the way you spell please? No, it's not, Your Honor. That's not the way you spell please, is it? No, it's not the way I spell it. How did it get in there? Again, Your Honor, it would have to be an oversight on our part. I understand the court's concern with the actual structural errors, but I would beg the court to, again ---- No, no, my concern is with competence of counsel. Yes, Your Honor. You know, and when I pick up a brief and I read all these things in here and see all those mistakes, maybe one, you know, two, but then you've got a whole paragraph here where you refer to your client as she, and wrong pages are cited, too. I don't think you prepared this brief. You're a very sharp, bright man. I appreciate that, Your Honor, but to be fair, that brief was authored by me or partly authored by me almost two years ago. I've had the privilege and the benefit of working with a very good attorney and being able to perfect my skills. Again, I would apologize to the court ---- Well, if that's true, you've developed fast. Again, I would apologize to the court for the inconvenience caused by the errors in the brief, but again, I would submit to the court ---- It's not an inconvenience. It's a lack of confidence in what you write down. Yes, Your Honor. Don't you understand that? At least it is to me. I understand, Your Honor. Anyway, if I read something, it goes on for pages and says, in addition to showing ineffective assessments by attorney, Petitioner must additionally demonstrate that the merits supporting her claim for relief would be viable if she can simply show that she has plausible grounds. And it goes on like that. Yes, Your Honor, and I do understand that. And that came out of a brief that she didn't pick up on Westlaw. Again, Your Honor, I apologize. And the only thing that I can tell you is that obviously the quality of the briefs that I offer are much better than perhaps that one was. And again, I would point the court's attention to the fact that notwithstanding the mistakes that were made in that brief, they really don't overshadow the mistakes that were committed by the immigration judge in this case and also by Attorney Peck, who, again, aside from the statutory right to counsel that the immigration judge deprived Mr. Mendoza of, he also needs to consider that there's a clear case of ineffective assistance of counsel, which I would welcome the opportunity to discuss further. You get another sentence in the brief that says, Judicial review of a denial of continuance is not barred because it is a nondiscretionary determination subject to review for abuse. My understanding is that a denial of a continuance, Your Honor, is reviewed for abuse of discretion. This court has consistently held that it has the authority to review a denial of a continuance. In that context, the court obviously can elect to review it for just simple abuse or in a case like this. No, you're saying here it's not a discretionary determination. It's not a discretionary determination. You have that here. Well, because if it would be a discretionary determination, then the arguments that were raised by the respondent in their brief in response to that would hold true because their argument, which they were able to strong, was that the Ninth Circuit wouldn't have jurisdiction over a denial of a continuance because it was, quote-unquote, discretionary. Our position is just simply that a denial of a continuance is a nondiscretionary determination, which is why the court can't invoke its jurisdiction because whether you want to call it a mixed question of law and fact that this court can review under Ramadan v. Gonzalez or just go by the prior cases where you've held that the court does have jurisdiction over this case, that was the only point that we were trying to make in that brief, Your Honor. At this time, I would welcome the opportunity to discuss the ineffectiveness of this case, but I do note that I am well over my limit, Your Honor. Just hold on for a minute. Yes, Your Honor. All right. You can have a seat. Thank you, Your Honor. Good afternoon. May it please the Court, my name is Phil Lewis. I'm with the law firm of O'Melveny & Myers. I'm here today with my colleagues, Matt Klein and Randy Wadoff. This court appointed our firm to meet this counsel on behalf of Mr. Mendoza. At the Court's permission, I would like to reserve one minute of time for rebuttal, if I may. Mr. Mendoza's case illustrates the overwhelming injustice that can befall even the most deserving alien when the system breaks down. This panel addressed this same case, the same situation in the Hernandez-Gil case, which we submit controls here. What Mr. Mendoza suffered, however, is far worse than the situation in the Hernandez-Gil case. Mr. Mendoza, a respected member of his community, father of three American citizen children, someone that even the immigration judge at the first hearing and the government counsel suggested likely qualifies for cancellation of removal. He hired a lawyer to represent him. He appeared at every court hearing every time he was told to. So what happened in this case? Why did this case go so wrong? What went wrong is that the system failed. Based on an inaccurate technicality, an incompetent lawyer, and a careless immigration judge, Mendoza was stripped of counsel, ordered deported, and after an abbreviated hearing that never reached the merits. I would like to answer Your Honor's question from early on, if I may. If Attorney Peck had appeared at the afternoon hearing, I would suggest that he would only first reveal his ineffective assistance and true ineffective assistance because Mr. Peck had been informed by the court on numerous occasions, numerous occasions, to bring fingerprints. It was Mr. Peck's obligation to make sure that that case was prepared. If he had showed up at the hearing, he gave no notice to the court. He didn't move to continue the case. Had he been unable to reach his client, he should have did what any competent lawyer would have done, which is to contact the court and try to protect his client's interest. There was no motion for a continuance. He didn't even try to withdraw from the case. It's hard to use language that's stating enough to discuss Mr. Peck's conduct. I still think we have a problem to deal with, which is that any adjudicator has to be able to control the caseload. A motion to continue is something that's within a wide discretion of any court. The history here is a case that has been continued multiple times, and we'll wind up visiting with the government some of the reasons it was continued, but it's inescapable. The case has been around for like five years, and the calendar of this particular court was apparently unbelievably congested because you get a date, your date's two years into the future. Mr. Peck shows up that afternoon, or even if he'd filed a motion to continue a couple weeks before, it's not hard to figure out what the immigration judge is going to do with that motion to continue. I mean, short of somebody suffering a heart attack in the courthouse steps, this case was not likely a good candidate for continuance under any circumstances. So recognizing that an adjudicator has to have authority to control his or her docket, why can't the immigration judge in this circumstance decide the reason isn't good enough because his evaluation of the facts, his hearing of what Mr. Peck said versus what the petitioner said was, you know, I think it was probably maybe the lawyer didn't push very hard, but ultimately it's the client's responsibility to get that stuff in. It's the client's responsibility to pick and supervise a lawyer. Here I am two years later, and we haven't made any more progress in this case. I can't grant another continuance, which has to be for another two years, just because they're not ready to go forward. This case has to move forward today. Your Honor, it's absolutely true that an immigration judge must control the docket in this case, but in this case there are several reasons why he abuses discretion and why in this situation and situations like it, like the Hernandez-Gil case, it wasn't abuse of discretion. First of all, in this situation, none of the continuances were Mr. Mendoza's fault. Certainly the case lasted for a long period of time, but if you look at each of the continuances, they were at the request of the immigration judge because of the calendar, at the request of Attorney Peck because of the scheduling conflicts, the two situations that the immigration judge cited in his brief, in his decision, as to why Mr. Mendoza had asked for continuance. His first was the July 3rd hearing. He said that it was continued to secure counsel, when indeed, if you look at the record, it was actually to secure, to specifically schedule the next hearing. It was not for him to secure counsel. The October 10 hearing was continued. The immigration judge said it was continued because Mendoza was unprepared. At a record of 82, you will notice that that is absolutely not what the immigration judge said at the time. He said that although the case is ready for a hearing, a priority case bumped at that point. So although it was a long period of time for an immigration case, it was all at the none of the continuance requests were by Mr. Mendoza, except when he was about to appear pro se and completely unprepared. Now, Mr. Mendoza, on the other hand, was not delaying this case. And so when the immigration judge was faced with Mr. Mendoza in his courtroom, he had, first of all, he had the right to rely on counsel. You know, if I failed to bring my binders with me to the court, my client would be very upset, and we don't blame the client for that. We don't expect the client to be carrying binders of information with him or her. It's my responsibility as a lawyer, and we don't impose that responsibility on an uneducated, an unsophisticated alien. He had hired, and this is what the Hernandez-Gil case says, he hired counsel. He had a right to rely on that attorney to competently represent him. Mr. Peck never withdrew from the case. Indeed, Mr. Mendoza showed good faith in trying to pursue his case at that time. He several times reached out to Mr. Peck. He had spent a large amount of money for him on hiring a lawyer. The prospect of hiring a second lawyer for someone who is of such modest means was unconscionable. And so, but he had to do it because he knew that this was an important hearing. And that's what doesn't make sense here, your Honor. Mr. Mendoza is facing deportation. He's going to be thrown out of the country because he has three American citizen children and his wife, their family has been here in the United States for years. Why would he not contact his lawyer? It just doesn't make sense. So when the immigration judge is faced with this information, and the Hernandez-Gil case again says this, you have the right to rely on your attorney.  And it is the duty, it's the duty of the immigration judge, an affirmative duty, to take reasonable steps to protect the alien's right to counsel. In this case, that didn't happen. In the Hernandez-Gil case, the lawyer had specifically asked, do you wish to have a lawyer here? The immigration judge never even asked. He didn't ask. He didn't care. He moved on with the case. Well, I'd pause there because a few questions could have been more pointless, given that Mr. Mendoza showed up with a lawyer. There's no question that he wanted to have a lawyer. The problem was that the lawyer, for reasons that are understandable, needed to continue to be able to do something about the case because he'd just been hired the day before. So I'm not sure I fault the immigration judge. There are things for which the immigration judge could be faulted. I'm not sure failing to ask that question is their most serious problem. And I'm also not sure, we've got one substantial difference between this case and Hernandez-Gil, and that's the history. If the IJ's decision, I'm beeping something, I apologize. If the IJ's decision or judgment or evaluation was that he believed Mr. Peck and that, in fact, Mr. Peck had tried to do what he could to get prepared, but his client was unresponsive, then I'm not sure it's a violation either of Hernandez-Gil or an abuse of discretion for the immigration judge to say, you've had years, you didn't do what I told you in court two years ago to do, I'm not going to give you another extension or other continuance just because you now tell me you'd like to hire a new lawyer. We're kind of past the right to counsel stage if, in fact, what Mr. Peck said was determined to be the actual fact. I don't know that a party can delay things indefinitely by not cooperating with counsel. Oh, I agree, Your Honor. I agree, Your Honor. That's not the case here, though. I mean, there is no, first of all, there's no evidence of bad faith on behalf of Mr. Mendoza, and this was the first time that Mr. Mendoza was seeking a continuance. Judge Fong made no express credibility determination, and so in this case, we need to accept Mr. Mendoza's expressions as true. Nonetheless, Mr. Peck's accusations were made off the record. They were not under oath. It violated his professional duties. They inherently lacked credibility. It was clearly a self-serving effort to cover up for his failure to prepare. And so, even more so, it's the same thing. Mr. Mendoza, to show up that morning, to sell out his client, yet didn't have the time to come by in the afternoon. He should have been there no matter what, and as the Hernandez case held, some lawyer is better than nothing. In fact, there was something, and I started to follow this up, and then I got sidetracked, and I just remembered it sitting here. There was an effort to track him down, and they didn't pick up from the record. It's like he wasn't found, and that was the end of it. Was there ever an explanation offered in the record as to what happened to him? There was a blank spot in the record, Your Honor, and that was part of the immigration judge's duty. Hernandez-Gill said it. The Lindt case cited it, and Hernandez-Gill said it. The impression I get from that decision, Your Honor, is that the immigration judge himself should have tried to reach out to find Attorney Peck, and he did not. He did not. And there were many more failings by the immigration judge than simply failing to ask for a waiver. Well, even the immigration judge admitted he got this information from Peck through the back door, and he came right out and said that. That is true, Your Honor, but those statements are still, again, there is no express credibility of the information, and the statements are inherently unreliable. The immigration judge not only failed to inquire about waiver, but again, going through Hernandez-Gill, he failed to take other affirmative steps to ensure that Mr. Mendoza's right to counsel was ensured. Now, if Mr. Mendoza was constantly, to answer your question, Your Honor, constantly coming back time after time with a new lawyer, and there was some indication that there was some that had faith involved there, then maybe it would be a different situation. But that's not the situation here. Well, we also had a situation where the matter had been set on calendar for a couple of years, and then it was set up for the 3rd of July, and Peck comes by and says, oh, you know, I'm having a 4th of July celebration at my home, and it's going to be difficult for me to really be here on the 3rd. So he says, okay, that's no problem. He continues it for another couple of years. It doesn't indicate to me that he's very much concerned about his calendar. I agree, Your Honor. That's an appropriate point. It also reflects on Mr. Peck's behavior that he's treating the life, the life of someone and his family, so cavalierly. Yeah. You've got some other man's future, his family's future, but he's more interested in having a hearty 4th of July celebration. And, Your Honor, if you look at the October 10 hearing, you'll notice that the immigration, if you, again, to answer your question, Your Honor, from early on, I believe it was your question, if you look through the transcript, you need to remember the context of the situation. Mr. Mendoza does not speak English. He's listening to these hearings through an interpreter. And the immigration judge is speaking as you and I are speaking here today. In the transcript, there are paragraph after paragraph after paragraph, full pages of the immigration judge speaking. I don't think so. And so, I'm sorry, let me go on. No, no, it's a real, we have a serious problem with our administration of our immigration laws. We know, we know that these notorious are rampant. And we know they control lawyers. We know lawyers work for them. I mean, everybody knows that. Maybe they don't know that in Washington, but we know it here. But they know it in Washington because we've talked to them about it. So, when he calls over there to his office, whatever it is, and he wants to talk to the lawyer, and they tell him, Oh, no, no, you have to talk to us. You know, you can't talk to the lawyer. Knowing what happens, that's all a very plausible response. And it happens so often that, just from our experience, we've seen hundreds of, I've seen hundreds of these cases, thousands maybe, where these lawyers come in right at the time of the hearing. It's the time they've seen the person. They're going to represent them. It goes on all the time here. Yes, Your Honor. It's a national disgrace. It is, Your Honor. And I am not as confident, if I may be so bold and with all due respect, I'm not as confident that the government actually understands that as well. You know, this was a case that should have been remanded. I mean, the Hernandez-Gil case came out right in the middle of it. It controlled. And this case, our case, Mr. Bindo's case, is far worse than that. It's a far worse situation. And Your Honor has opined also on the notarial issue. So it should be remanded. I see that I'm running out of time. If there are no other questions, I simply emphasize the compelling need for this Court to set right the substantial injustice here, as Your Honor was saying, and reaffirm the fundamental rights Congress guaranteed all aliens that were so readily discarded here. The Immigration Court cannot continue to malfunction so badly to the detriment of so many. Thank you. Oh, yes, I was here before you several times. Welcome back. Welcome back. Yes, it's always fun to come out here and get some nice weather. Don't worry about it. Good morning, Your Honor. My name is Carol Federighi. I represent Respondent Attorney General Gonzalez in this matter. As Your Honor is aware, the issue in this case is whether the immigration judge clearly abused his discretion when, after the case had been pending for five years, he denied Mr. Mendoza a further continuance after he showed up at his merits hearing with an attorney that he'd hired only the day before. Counsel, he did have an attorney of record, right? Other than the one he brought with him, Mr. Peck was his counsel's record and didn't show up for the hearing. How can you distinguish Hernandez-Gil? And what shows, like, a knowing waiver of his statutory right to counsel? First, I'll answer the first part of your question first and then the second part. He showed up at the hearing with another attorney, unlike Mr. Hernandez-Gil, and said, I want this attorney, Mr. Bocci, to represent me. Later, after Mr. Bocci went out to look for Mr. Peck in the courthouse, Mr. Bocci came back, and if you look at the transcript on page 92 of the administrative record, Mr. Bocci says, I just got the file from Mr. Peck, and I'm looking at it now. So clearly, at that point, Mr. Peck had turned the case over to Mr. Bocci, and Mr. Bocci was then going to be Mr. Mendoza's counsel of record. And, in fact, the judge just above on the page said, you know, if you're planning to substitute Mr. Peck out today, I assume this gentleman here is ready to represent you and proceed in your case. You're quite right, but there was no substitution of counsel entered, and he didn't give the new counsel a continuance. So whether it's right or wrong, under Hernandez-Gil, didn't he have a duty, if Peck apparently was in the building or in the area, to take steps to get Peck into the courtroom? He did take steps, as I said, to locate Mr. Peck, and Mr. Bocci came back with the file saying, I'm handling the case now. But doesn't that suggest, if the other guy came back with the file and said that, wouldn't that suggest that Peck was present or nearby? Yes, it suggests he was in the courtroom somewhere, but no longer was representing Mr. Mendoza. Go ahead. But Peck had not been relieved of duties by the judge formally, right? There's no express statement in the record, but I believe a substitution under the local rules of that court can be handled fairly informally. And I pulled this off the EOR's website. This is the L.A. Court's local operating procedures, and they do say a substitution of representation shall be requested by a written or oral motion accompanied by a Form EOR-28, which Mr. Bocci did submit. So I believe that it's basically allowed to be handled by an oral procedure, and that's what they were doing in this case. So I believe that Mr. Peck was effectively... Mr. Peck didn't make a motion to relieve his counsel. I mean, he came in there with his backdoor information. That's what happened, isn't that right? Mr. Mendoza made a motion to substitute... Well, what's the poor guy supposed to do? He tells you that he can't get a hold of this guy for two years. He calls over there. You know, there's no adverse credibility finding made. And, you know, can I tell you something? This isn't the first time this has happened with that particular immigration judge. Others have backdoored, and I can give you examples of it too. If you could, Your Honor, I'm not aware of any. Well, I'm telling you that others have backdoored. And one guy that's backdoored is a guy named McGuire. Huh? I think I'm absolutely right on that. And who is McGuire? When we checked on him, you know... Oh, Mr. Terrence McGuire. Yeah, Terrence McGuire. The same thing. Right. The same M.O. The same exact thing happened with the same immigration judge. With the same consequences. Now, is that American justice? Is that the... I don't know if the... McGuire was sort of intentionally involved in the Hernandez-Gil cases. I'm not sure if that's the case, Your Honor. No, no, other cases. Some other cases. Well, in any event... McGuire had pled guilty to 28 counts of stealing his client's money before the state bar. Huh? Right. And 18 different cases. And we know that in the immigration court, a disbarred lawyer could come and practice. We know that, don't we? That's the rule. Yeah, and still... Yeah. But in general, I think EOIR does act against attorneys once they've been disbarred and then disbars them from practice before the immigration court. But I'm not sure exactly how the process works. No, I mean, you... But... I was called up once and I asked. Oh, yeah. A disbarred lawyer can practice here. We take the view that a disbarred lawyer is better than no lawyer. So we're creating the situation. Yeah, I think... I mean, we know, we know, the Justice Department knows that these notorious are out there just sucking the blood out of people and getting the money out of them. They don't go to work for nothing. You know, these people work. They have to struggle. They save their money and then they pay these people. Then they get their relatives to come up with money. Our country knows this is going on. You know, aren't we complicit in all this? Aren't we haters and offenders? Well, let's look at Mr. Mendoza's situation. And he said he did try and contact his attorney, Mr. Peck, through the notaries. Yeah, he did try. But then he later admitted that he had been negligent in not acting more quickly and more diligently. After this guy was badgering him, you know. And who even knew whether he understood what it was about. How can you say the guy was negligent when that first I.J. said, you know, I think that you can qualify for suspension of removal or deportation. Here's a form. He goes out and fills it. You know, he's in prison, right? He gets all the certificates. He gets everything he needs. He brings it to this judge. And the judge says, well, I'm sorry, I made a mistake. I got to give you the wrong form. You know. So then we let him go on bail. So he comes back to, he lives in Lancaster. You know, I mean. Well, first, let me, the I.J. didn't say that he thought he was a good candidate for cancellation. He just said he met the minimal requirements for cancellation. And that he'd been president in the country for ten years and had a qualifying relative. That's all that really he made the determination on in the initial hearing. So he says, look, I see that you meet these minimal qualifications. You should go ahead and fill out an application. And he provided him, as you said, with the wrong application. But that was cleared up fairly quickly. And he was released and managed to obtain an attorney, Mr. Peck, who did prepare his case, did submit the correct application, did submit documentation, and was apparently ready to proceed on October 10th, 2001, when because of the immigration judge having to move things around, he was going to have a conflict. Doesn't that by itself raise a problem? Because that's what happened in October 2001. But if you look at the decisions from the I.J. and the BIA, it gets characterized differently than that. The characterization that I see is that the petitioner is not ready, so he gets more time. The continuances are attributed to him. When, in fact, with regard to October 10, I couldn't tell whether it was the I.J. had a priority matter, and the lawyer looked like he didn't want to wait around, so it got pushed off for two years. Whether it was the I.J., the lawyer, or both, it wasn't Mr. Mendoza. That's correct. I would look at if I could answer that. The lawyer didn't want to wait around, so he gave him two years. The lawyer doesn't want to disturb his Independence Day holiday, oh, we'll give you two more years. Then you blame Mendoza. Is Mr. Mendoza in the courtroom? Does anybody know where Mendoza is? Not today. I don't know. Where is he? I can inform Mr. Mendoza about the hearing today. Lamentably, he and his wife were involved in a car accident not too long ago, and due to the injuries that he sustained, he had to be able to come here from Lancaster. In my closing, I wanted to offer that he had mentioned to me that he wanted to tell you all this. When did you notify him? I found out that the case had been put on hold. I told Mr. Mendoza that he was aware that the court had appointed a counsel to assist with the case. He also had expressed some troubles regarding his current employment. Considering the fact that he was involved in the accident, I wasn't going to really... Well, I'm glad you talked to him, because most of the lawyers that come in here and I ask them that question, they don't even know where their client is. And I haven't talked to him for two years. I don't know where he is. I'll get my medics to explain it to you. Yeah. Okay. I commend you. I commend you for that. As far as the reasons for the prior continuances, I don't think it actually really matters what the reasons were. And I agree with you that the IJ had a somewhat garbled account of the reasons for the prior continuances. Why doesn't the government admit error here? Because we don't believe there was an error. Come on. Come on. Well, in the case that was pending for five years... Anyway, to finish my answer, the board, when it talked about the continuances in the board decision, they corrected most of the inaccuracies in the IJ's description of the continuances, except for the July 3rd date and what happened on that date. What happened was that the merits hearing was scheduled for August of 2000. And sometime prior to that, in June of 2000, the immigration judge realized he was going to have a conflict, so he was going to need to move the August hearing. So he set a scheduling hearing for July 3rd. It's at the scheduling hearing that Mr. Peck said, well, I can't be there. I have prior plans. And the immigration judge essentially excused his absence on that date because they were just meeting to set a new hearing date. And Mr. Mendoza showed up and said, Mr. Peck told me to accept any date. They set a new date for the merits hearing, and that was the October date that was set at that time. So... You see, the concern I have there is that when you go to... And the IJ had it factually flat wrong. The BIA did not. But the BIA says, well, in view of the numerous and lengthy continuances which are granted in this case, we conclude the IJ was within his discretion. The thing is that the only person who had nothing to do with any of the continuances was Mr. Mendoza. And yet, what the BIA points to is, look at all these continuances. And then you get to the day that ultimately matters, and I haven't had nearly the years of experience that Judge Pragerson has, but I have to say, this form of the attorney coming in in the morning and talking to the IJ in a way that remarkably bad-mouthed his own client, and then not being seen again, seems to me to be an unusual way to make a record for why Mr. Mendoza needs to find new counsel. Have you experienced a case where, in the morning, the attorney goes in and bad-mouths the client, and in the afternoon, the client's left out to dry? No, I haven't seen any cases like that, which is why I was interested to hear about Mr. Pragerson's experiences and what cases, you know, to get information about what specific cases... Did you just know Reiki was a peculiar way to run a railroad? You know, without more experience with that type of situation, I can't really say. To me, it read as something that they ran into each other in a casual way. Perhaps he was there for some other case or some other matter. I don't know, but in any event... I'm sorry. I don't know that he would casually not show up at the courthouse at the appointed time. But at that point, we don't know what communication went on since the morning, and at that point, Mr. Mendoza had another attorney, so there was no need for... He had another attorney who wanted a continuance, but he didn't have another attorney apparently ready to go ahead there, right? No. No, that's true. Didn't the judge proceed with him pro se rather than have that new attorney represent him? Maybe he couldn't, but... I mean, what seems strange here is the whole thing is a comedy of errors, which Mendoza didn't create in large part. He never gets a hearing on the merits represented by counsel. It seems to me that unless the government can show a knowing waiver of his counsel rights, that he's entitled to have a hearing again with the counsel. As far as the knowing waiver, this isn't really a case of waiver. It's a continuance case, and the question in that is whether he was given a reasonable opportunity to obtain counsel to represent him at the hearing, and he was. And that's always been the standard. He had two years between the time of the prior hearing and this hearing, during which time at some point he became dissatisfied with his attorney, and... The attorney never called him back. He never wrote to him. Did the immigration judge say to this guy, Pack, you got copies of those letters? Oh, I don't have them with me. Well, we've got a fax machine right here. Call your office and have them fax them over here. That's all you've got to do. And if someone comes up there at the last minute and they want a continuance, and they say they've got a lawyer, you know, what do you do? You say, okay, I'll give you a continuance. How about a week? That be enough? Okay. See you in a week. Come back in a week. But the problem is the judge couldn't set a hearing for a week. Oh, come on. You can do that. I was a trial judge for I don't know how many years. You always got flexibility. I'll bet if you go down there right now, there's courtrooms that are open and people who aren't busy over there. But that brings up another point, though. One thing that might have helped in that scenario was if Mr. Mendoza or Mr. Bocci had let the court know ahead of time that something was up, that one, that Mr. Mendoza was growing dissatisfied with his attorney, that he was worried that he wasn't going to be prepared in time. Well, he's got Bocci, who's a member of the Wyoming Bar, you know. I don't know what he's done down here. You know, file a motion, a written motion. It's not a game for Bocci to file something. I think the BIA never filed it anyway. So this is what goes on over there. There are other problems with Mr. Let's get to the more sort of substantive problems with Mr. Mendoza's case, which show that there was no prejudice. No matter what happened with the shuffling of attorneys, there was no prejudice to Mr. Mendoza. First, he hadn't submitted the necessary fingerprints. He said he'd done it a year ago but had left the documentary proof at home. It's not clear he did it within the time frame necessary for the hearing because they have to be done, I think, within six months or so of the hearing or they're considered too stale. He knew about this requirement, obviously, because he said he had gone and done the fingerprints, but he hadn't kept up with it. Who do you expect really to be submitting those fingerprints? He has to submit them. But if you look back at the prior hearing and the judge goes through the litany, which he went through in this case more than once, the transcript is pretty clear in terms of who he's talking to. That paper's being submitted. He's talking to Mr. Peck. It's Mr. Peck who he believes, but he's talking to Mr. Peck, and yet Mr. Peck's the one that seems to stay here in terms of getting away with not doing what he's called upon to do. Well, Mr. Mendoza's admission or statement that he had gone to get his fingerprints done at some point, to me is indicative of the fact that Mr. Peck had told him you need to go get your fingerprints done and had made him do it, but then nothing had happened in a timely fashion for this hearing. If you were a betting person, would you bet that that was more the responsibility of Mr. Mendoza or Mr. Peck? Again, I think it was the responsibility of Mr. Mendoza because that's during the time period when he was growing dissatisfied with Mr. Peck and was felt like, and I'm saying this is believing everything Mr. Mendoza said and throwing out the backdoor conversation. So if you believe what he says, he was growing dissatisfied with his attorney. At some point, he should have exercised due diligence to contact another attorney, given his concerns, and that other attorney, if he had contacted that attorney in sufficient time, would have then been able to prepare for the hearing, including sending him off to get his fingerprints done. That's wonderful and all that in theory, but where's he going to get the money to go hire an attorney? He's already paid for this guy. Huh? He's already paid for him. Well, as far as I can tell from the record, he's only paid $1,000 to this individual. You can't tell just from the record. If I were a betting person, I'd bet you he's paid a lot more than $1,000. But in any event... And then if you're going to believe Mendoza, you're not going to believe Peck. What about Peck telling him, if you don't say these things, I'm not going to represent you? And he said, I'm not going to lie. And that's when Peck goes in. So we're believing Mendoza now. So now Peck goes in. He backdoors this information to the immigration judge. Again, throwing out... Well, that information that Mendoza said about the conversation at the courthouse door, that was only submitted afterwards to the board. So it has nothing to do with the immigration judge's decision about the continuance. That explanation was not before the immigration judge. And in fact, one has to wonder why it was not brought up by Mr. Mendoza when the immigration judge kept asking him, well, what is the reason you want a continuance? Well, it's another not very shining moment, because if you look at the discussion between the immigration judge and Mr. Mendoza, Mr. Mendoza barely got an opportunity to put a word in edgewise. The discussion was a little more of a monologue, I'm afraid. That may be true, but Mr. Mendoza was not saying anything, not providing any reason, other than, you know, he did mention money at one stage. But again, costs, I mean, in an alien economic situation, unfortunately it's not a consideration in whether they're, you know, in whether they're... If they can't afford an attorney, that's unfortunate, but that is the situation. Let me just repeat one more thing, and then I am running out of time. There's a lot of good lawyers around that they can get pro bono, you know. I've got them sitting here right now, you know. And we have other organizations that do it. The public council does it. And other organizations do it. You see, one of the problems is that almost anybody can practice before the immigration judge. You don't have to take a course in law school and immigration, which is second in complexity to the Internal Revenue Code. But in this case, this was not a complicated case. And my last comment is that there's nothing in the record showing hardship at all, nothing even that petitioner has submitted since the hearing to show, well, I had a viable cancellation of removal case. There is nothing in the record to show any hardship to U.S. citizens. But there's an inherent prejudice when you've got ineffective assistance of counsel, and also when you're denied your right to counsel, and you haven't waived your right to counsel. As I said, our case, your case... Let me ask you a question. Do you think he got a fair hearing? Do you think Mendoza was treated fairly? Yes, I do. I do. You do? I do believe he was. He had five years to prepare a case. There's nothing in the record. No, he doesn't have five years. The lawyers got it. His lawyers had five years. There's nothing in the case. The lawyers got it and never did anything. They did. The lawyers submitted quite a number of pages of documents and so forth. Which Mendoza gathered. Right. But he didn't show any... There's nothing in there showing hardship, which is the linchpin of a cancellation of removal case. And that's why I believe that the result in this case is correct. We don't know until we get into it. We don't know until... Yeah, he never at any stage argued that there was a viable case that... Well, whose job was it to do that? Mendoza or his lawyers? He's had lawyers all along, even in the appeal process when he filed them... When he sought remand for an ineffective assistance to counsel claim at that stage, it would have been appropriate to introduce evidence of his cancellation of removal claim to show prejudice. He didn't then, and he was represented... How is he supposed to know that? He's represented in his appeal. By whom? By Mr. Bochy. But Mr. Bochy, who doesn't follow through. Who isn't even admitted to practice law in California. He is a member of the bar, so I don't see that at all. Yeah. Yes, and he's been represented here and still no evidence, no mention even of hardship to his children that would meet the requirements of the statute. So... How old are his children now? You can ask them that, obviously, but his son, he has a son born in 96, one born in 2001, one born in 2002. So they're still fairly young. Would be able to make the adjustment to Guatemala. How old is he? 11. Well, this is 11, yes. Okay, well, things last long enough over there in Iraq. Those boys will be out there fighting for us. Think about that. And there's no indication that I'm interested in joining the military. Well, you'll find out. They're still a little young for that right now. Yeah. What did you say? Hopefully they will be out of Iraq. They're a little young for that right now. Yeah. Well, we're going to be there a long time. Out there someplace else. So if there are no further questions, Your Honor, we ask that the petition for review be denied. Thank you. Go ahead. Your Honors, I just have a few points that I'd like to make for rebuttal purposes, and then I'll conclude my argument. First and foremost, I think that I'd like to touch on a point that a counselor responded to me regarding the statutory rights of counsel. I just really want to make the point that this court, in prior decisions, has clearly distinguished the difference between an alien who obviously has a statutory right to counsel and who is requesting time to look for an attorney and how much time a judge is supposed to give that alien to find an attorney, compared to a different situation where the alien has already engaged an attorney, has already contracted an attorney, the attorney has already made numerous appearances, and the waiver that's required for those types of situations, which I think is something that this court outlined very well in Hernandez-Gil, it's clear that it has to be knowing and voluntary. Our position is that the facts here do not demonstrate it was either knowing or that it was a voluntary waiver, even assuming that there was a waiver involved. Yeah, okay. Well, we know. Yes, Your Honor. Do you have a copy of our court's immigration manual? Absolutely, Your Honor, I do. Good for you. Yes, Your Honor. I've had the opportunity to look at it a couple of times, and it's very thorough. Where did you go to school? I'm sorry, Your Honor? Where did you go to school? Undergraduate, I went to Loyola Marymount University. Law school, I went to Loyola Law School in Los Angeles, Your Honor. I grew up here in L.A. Both of my parents were immigrants, so I understand. Where did you grow up in L.A.? In Bell Gardens, California. It's a city that's— I know Bell. Oh, I'm sorry. I grew up in Boyle Heights, you know. Oh, okay. I know what's going on. Ninety-seven percent Latino. You're a rough rider. Do you know what a rough rider is? I do, Your Honor. What is a rough rider? Well, my interpretation, at least as I know it, is that it's someone who's kind of had it rough. I don't know. Maybe I'll just ask you what the definition is, Your Honor, so I can make sure that we're— You were here at Roosevelt High School? Absolutely. My mom went to— What's a rough rider? My mom went to Roosevelt High School. Yeah? When did she go there? She went back in the 70s. She wasn't able to finish school because she had to work. I left at 41, so I do. Oh, yeah. My mom— Let's just move to each other. Okay. All right. Aside from that point, I wanted to touch on something that—I'm sorry—Judge Clifton, Your Honor, Judge Clifton had talked about regarding the gap in time and what had happened. Regarding that, Your Honor, it's clear from the record that there comes a time when, after immigration, after Judge Fong discovers that Mr. Peck is in the building, that you take the brief recess. Obviously, the record itself doesn't demonstrate the transcripts. It doesn't reflect what happened during that course other than they weren't able to find him. However, I would respectfully direct the court's attention to the declaration that was submitted to the board where Mr. Mendoza makes clear what happened. What happened is he went outside during the break, he encountered Mr. Peck, and he explained to him what was going on. Mr. Peck's statements to him were, go back and lie. Go back and say that it was your fault. Otherwise, I will not go back in there with you. Mr. Mendoza refused to do that, which was why Mr. Peck did not return. Now, obviously, I understand that there are, let's say, two sides to this story, but I would submit to the court that at least under Ninth Circuit jurisprudence, any statements that are made by an alien in a declaration that's submitted to the DIA must be accepted as true unless they're inherently unreliable or unless some type of clear negative credibility determination is made. Both of those are absent from this situation. So to answer your question, Your Honor, our position would be that Mr. Peck was there. He was outside. He encountered Mr. Mendoza. And then after Mr. Mendoza was unwilling to extend the ineffectiveness that he had already demonstrated, he left. And again, he left Mr. Mendoza without any type of protection, and clearly that's ineffective assistance. Lastly, I'd like to point out something that I know Amica's counsel very detailed very well in their reply brief, and I'd just like to note it to the court. In prior cases, specifically Zios Verios, which is a case that obviously has been cited multiple times by this court, it was suggested that when a violation of the right to counsel is so egregious based on the review of the facts, that there may be a circumstance when prejudice doesn't even need to be examined. So in response to the government's position, to the respondent's position, regarding whether or not under traditional analysis there may be some form of prejudice, we would submit to the court that perhaps this is an opportunity for the court to examine what I know Amica's counsel cited to other circuit courts have already held, which is that in some circumstances, the denial to the right to counsel is essentially, in and of itself, prejudicial per se. And I would additionally point out that this court, in other circumstances involving due process, has made certain types of exceptions. Thank you for your time, Your Honor, and for the reasons we asked at the court, and the position in this case. Let me answer this. Yes, Your Honor. I'm sorry. I'm just expressing my own personal preference. Yes, Your Honor. I want to see O'Melody and Myers. I'm sorry, Your Honor? I want to see O'Melody and Myers in this case to the end. Yes, Your Honor. You know? So how are we going to work that out? I... Your Honor, we're happy to work with them. So that's great. I'm fortunate enough that I've been able to build a pretty strong relationship with Mr. Lewis, and he's really helped me a lot in the case, and we've been able to communicate back and forth regarding the arguments that we want to present in this case. So I'm sure that if we need some type of assistance or anything, that we can always count on Mr. Lewis to help us. How about allowing them to be lead counsel when it goes back, if it should go back? That's something that I would be happy to bring to Mr. Mendoza's attention in a nice situation where he could speak to both myself, my supervising attorney, also Martinez, and with O'Melody and Myers, and if Mr. Mendoza was to elect to go forward. I think it's important for them to do this. You know why? Yes, Your Honor. You know why? I'm sorry, Your Honor. Because they're a worldwide institution, you know, and they need to know, and others need to know what's going on over there. If you get up and you try to tell the story, not too many people are going to listen to you. Not too many people are going to listen to me either. But if they go in there and they see what's going on, people will listen. You understand what I mean? I absolutely understand, Your Honor. I don't know whether Warren Christopher is still the managing partner or not, but he carries a lot of clout in this world, and this story has got to get out. People have got to know what kind of a system we have and how we treat poor immigrants. If you happen to be, you know, got a Ph.D. or something, you get a job somewhere, they've got the best lawyers in the country, you know, to figure out a way to keep you here legally. And I agree, Your Honor. Most of the world don't have that. And perhaps in addition to the concerns that you've already expressed and the possibility and the likelihood that someone like O'Million Myers could help redress those types of issues, we would also pose to the Court that here you have before you a legitimate and clear opportunity to, you yourself, also make a statement regarding backdoor discussions, improper withdrawals, ineffective assistance, and so forth, Your Honor. I've been hearing that for a long time. All right. And voice it to the wind. I understand, Your Honor. So you understand my message. I 100 percent understand, Your Honor. And I thank you all for your time. Say it loud enough, because I hear it in Bell Gardens. They've been hearing it in Bell Gardens for quite some time, Your Honor. Who the developer of Bell Gardens was? I don't. I remember that it used to be called Dilly Goat Acres before it got renamed to Bell Gardens. Bell Gardens was developed by Alonzo Bell, who developed Bell Air, who discovered oil and Brea, and they were next to it. So they built Bell Air, Bell, Bellflower, Bell Gardens. Absolutely. I think I'm right on that. No, you are. That whole area used to be an orange group, which is why there's names for the cities like Southgate, Bell, Bell Gardens, because literally Southgate was the Southgate of that huge farm. Again, thank you so much for your time, Your Honor. Excuse me. Your Honor, we are happy and honored to help carry the torch in this case. And with your help, we'll be able to send that message. Just a couple of brief items. I would like to answer the question whether Amica Council feels that Mr. Mendoza was treated fairly. And you know what the answer is, no. Only $1,000? If Mr. Mendoza is working in a $20,000 a year job, which is actually a lot, 5% of his annual income before taxes. I work, as you know, with Ameldi and Meyers. We represent some of the largest companies in the world. We would never do what Mr. Peck did. We'd never get another client. The only reason why that happened here is because Mr. Peck, Mr. Mendoza, is an immigrant. And in these situations, the attorneys know, you know, if they mess up, they'll probably be deported before he can sue for malpractice. So those are a couple of points. A couple of other brief points. Mr. Mendoza only asked for a brief continuance. What shows a knowing waiver? Nothing. There's nothing in the record that shows a knowing waiver. And indeed, in this case, Mendoza rightfully relied on his counsel. The immigration judge instructed Mr. Peck on countless occasions in the record at page 73. Also, counsel, make sure you do a state of INS criminal record check at the record at 83. Mr. Peck, please remember your need to provide updated materials and documents, including a fingerprint check. More importantly, when Mr. Mendoza appeared without Mr. Peck, which is at the record at 78, the immigration judge said, now, sir, because you are on your own, paraphrasing, I need to provide you the reminders that I would normally give to your attorney, which includes getting a fingerprint check. Now, Mr. Peck was told this on countless occasions, yet that was not passed along with the file to Mr. Boce. Those fingerprints never made their way into court. Indeed, there was no withdrawal, and even if the withdrawal was oral, the lawyers have a duty, as the immigration judge does, to try to prevent prejudice to Mr. Mendoza. And that did not happen here. So thank you. If there are no questions, thank you very much. Thank you. I appreciate all the arguments, and I'll take this matter under submission. I appreciate the work of Mika's colleagues very much. And Mario Acosta, you've got a good future. Yeah. Okay. All right.
judges: Pregerson, Gould, Clifton